# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

KELLI A. GETTNER,

       Plaintiff,

vs.

JO ANNE B. BARNHART,
Commissioner of Social Security,

       Defendant.

No. C05-4096-MWB

**REPORT AND RECOMMENDATION**

---

## *TABLE OF CONTENTS*

*I.*    *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

*II.*   *PROCEDURAL AND FACTUAL BACKGROUND* . . . . . . . . . . . . . . . . . **2**

     *A.*    *Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**
     *B.*    *Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**
          *1.*    *Introductory facts and Gettner's hearing testimony* . . . . . . . . **4**
          *2.*    *Gettner's medical history* . . . . . . . . . . . . . . . . . . . . . . . . **8**
              *a.*    *Seizures, headaches, and other medical treatment* . . . . **8**
              *b.*    *Mental health treatment* . . . . . . . . . . . . . . . . . . . . **15**
          *3.*    *Vocational expert's testimony* . . . . . . . . . . . . . . . . . . . . **21**
          *4.*    *The ALJ's decision* . . . . . . . . . . . . . . . . . . . . . . . . . . . **22**

*III.*   *DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND*
       *THE SUBSTANTIAL EVIDENCE STANDARD* . . . . . . . . . . . . . . . . . . **24**

     *A.*    *Disability Determinations and the Burden of Proof* . . . . . . . . . . . **24**
     *B.*    *The Substantial Evidence Standard* . . . . . . . . . . . . . . . . . . . . . **27**

*V.*    *ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **30**

*VI.*   *CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **32**

# I. INTRODUCTION

The plaintiff Kelli A. Gettner ("Gettner") appeals a decision by an administrative law judge ("ALJ") denying her application for Title XVI supplemental security income ("SSI") benefits. Gettner claims the ALJ erred in failing to evaluate her mental impairment using the correct regulatory standard. (*See* Doc. No. 10; *see also* Doc. No. 16)

# II. PROCEDURAL AND FACTUAL BACKGROUND
## A. Procedural Background

The procedural history of this case is somewhat confusing. On August 30, 2002, Gettner filed an application for SSI benefits, alleging a disability onset date of January 1, 2000. She alleges she is disabled due to seizures, mental illness, migraine headaches, and learning disabilities. (R. 60; *see* R. 357-98) The administrative record does not contain an application for Title II disability insurance benefits ("DI benefits"), but the List of Exhibits in the record refers to Gettner's application as one for DI benefits, rather than one for SSI benefits. (R. 1) In addition, in her brief, Gettner states she is addressing "the merits of her applications for Social Security Disability Insurance Benefits and Supplemental Security Income disability benefits," although she only discusses an application for SSI benefits. (*See* Doc. No. 10)

Gettner's SSI application was denied initially and on reconsideration. (R. 35-41, 43-47) Gettner requested a hearing (R. 48), and a hearing was held before ALJ George Gaffaney on October 13, 2004. (R. 357-98) Gettner was represented at the hearing by non-attorney Lee Sturgeon. Gettner testified at the hearing, and Vocational Expert ("VE") Roger Marquardt also testified. At the hearing, Mr. Sturgeon and the ALJ engaged in a colloquy concerning Gettner's alleged disability onset date based on her date last insured for Title II purposes, and Gettner amended her alleged onset date to December 1, 1994,

to place the date within the period when she was last insured for Title II purposes. In addition, both Mr. Sturgeon and the ALJ questioned Gettner about her job history prior to December 1994, on the basis of her amended alleged onset date. On January 25, 2005, the ALJ ruled Gettner was not entitled to benefits. (R. 15-23) Gettner appealed the ALJ's ruling, and on June 20, 2005, the Appeals Council denied Gettner's request for review (R. 7-10), making the ALJ's decision the final decision of the Commissioner.

In the ALJ's decision, he noted Gettner had amended her alleged onset date to December 1, 1994, but he further noted, without making any mention of an application for Title II benefits, that "the earliest entitlement date in a Title XVI claim is the date of filing, which in this case is August 30, 2002." (R. 19) He made no mention in his decision of an application for Title II benefits.

Gettner filed a timely Complaint in this court, seeking judicial review of the ALJ's ruling. (Doc. No. 4) In accordance with Administrative Order #1447, dated September 20, 1999, this matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), for the filing of a report and recommended disposition of Gettner's claim. Gettner filed a brief supporting her claim on December 18, 2005. (Doc. No. 10) On February 28, 2006, the Commissioner filed a motion for remand pursuant to sentence four of 42 U.S.C. § 405(g). (Doc. No. 13) The undersigned directed the Commissioner to file a brief on the merits (*see* Doc. No. 14), and the Commissioner filed her responsive brief on March 3, 2006. (Doc. No. 15) Gettner filed a resistance to the Commissioner's motion to remand on March 13, 2006. (Doc. No. 16) Notably, in their briefs, neither of the parties has discussed anything other than Gettner's application for SSI benefits.

Because of the discrepancies noted above, the court ordered Gettner to file a statement clarifying the nature of her claim that is before the court for judicial review. (*See* Doc. No. 18) On April 28, 2006, Gettner complied with the order and filed a

response in which she indicated her application is for SSI only. The court concludes the only matter under review is the denial of Gettner's application for Title XVI supplemental security income benefits. The matter is now fully submitted, and pursuant to 42 U.S.C. § 405(g), the court turns to a review of Gettner's claim for SSI benefits.

## B. Factual Background

### 1. Introductory facts and Gettner's hearing testimony

Gettner was born in 1970, making her thirty-four years old at the time of the hearing. She graduated from high school, where she was in special education classes for a learning disability. She has had no additional education or training since high school. (R. 362-63)

Gettner described her work history for the last fifteen years. In late 2001, she worked in food service for about three months. She only worked four hours a day and she was paid minimum wage. She was fired from the job for missing too many days of work, which she stated was due to migraines and seizures. (R. 364-65) In 1992, she cleaned rooms at a motel briefly. She worked twenty hours per week and was paid minimum wage. Records indicate she earned about $3,000 during 1992. (R. 366) From 1990 through early 1992, she worked at Arby's, preparing food. In 1989, she did the same type of work at Long John Silvers. In approximately 1989, she worked in the laundry room at a nursing home, folding sheets and towels. She worked about twenty-eight hours per week and was paid minimum wage. All of her jobs required her to be on her feet all of the time, and none of them required her to lift more than a few pounds occasionally. (R. 366-69)

According to Gettner, she has been unable to work full-time, or even for enough hours to make a living, since December 1994. She has had migraine headaches ever since then, and her headaches have worsened over time. When she last worked, in 1992, she

4

had migraines about one day per month, and she rated her headache pain at that time as about a seven on a ten-point scale. On a day when she had a migraine, she was unable to do any normal household chores, take care of her child, or do other activities. (R. 370-73) She still has only one migraine headache per month, but now her headaches last up to seven days. While she has a headache, she is unable to care for her children, do household chores, or do much of anything at all. When she has a headache, "even breathing hurts," and "thinking is impossible." (R. 384; R. 373-74) She has three children between ages six and ten. When she has a headache, she has friends from church who come in and help her care for her home and her children. (R. 374) When she is not suffering from a migraine, Gettner is able to do all of her household chores and other ordinary activities. (R. 387)

Gettner stated she can tell when she is going to get a migraine because she will "get an aura," and she experience smells, tastes, and photophobia. Imitrex sometimes helps her migraines. (R. 390)

In addition to her migraines, Gettner has a seizure disorder. As far as she could recall, ten years ago she was having grand mal seizures two or three times per month, although she stated the frequency of her seizures would depend on her stress level. During a seizure, she is not aware of what is happening, although others have told her that she jerks around and sometimes trie to put her hand down her throat. (R. 374-75) Her husband, children, and mother all have observed her having a seizure. (R. 375)

In September 2003, she was hooked up to an EEG machine at the University of Nebraska at the time she had a couple of seizures. She also was videotaped while she was having the seizures. According to Gettner, this was important for her because until that time, doctors had been unable to confirm that she had been experiencing seizures. She has tried various medications over the years. Some of them would help for awhile and then they would quit working, so doctors would change her medications. The longest period

of time she can recall being seizure-free is five or six months; however, she stated she may have had seizures during that time period that she did not know about because they were not observed by anyone. (R. 375-77, 379-80) According to Gettner, she has been diagnosed with epilepsy, which is the cause of her seizures. (R. 390-91)

Her most recent seizure prior to the ALJ hearing occurred in August 2004, while she was visiting her mother in Kansas. She had a nocturnal seizure that was witnessed by her parents and her children. When she has a nocturnal seizure, she sometimes wakes up frightened and then she blacks out. (R. 377-79) The next morning, she will feel stiff and sore, nauseous, fatigued, and her tongue will be "chewed up." (R. 379) The day after she has a seizure, she will be very tired and have trouble concentrating and performing everyday tasks. (R. 391)

Gettner stated she also has experienced some daytime events that she believes are seizures. She stated, "I've found myself feeling very, I don't know, lightheaded or strange and then a feeling of not knowing where I am and then it seems like minutes, maybe even hours have passed and I don't know where the time's gone." (R. 380-81) She stated these episodes began occurring only recently, and their frequency seems to depend on her stress level. (R. 381)

Gettner stated she also suffers from depression. She sees a mental health provider for her depression and a specialist for her seizure disorder. (R. 381) She stated she has difficulty being around people because she becomes self-conscious, nervous, and scared. She panics a lot, feels people are judging her, feels stupid, and fears she will say the wrong thing. (R. 387)

Gettner recalled that the Social Security Administration had sent her to see a Dr. McMeekin in about 2002, for an evaluation that included an IQ test. She stated she did her best on the IQ test. She indicated she has some difficulty with reading and writing, but she can read a newspaper article and remember what she has read, and she can look

up a number in the phone book if she knows how to spell the name.  (R. 381-82)  However, one of her jobs required her to do some paperwork and read instructions, and she had difficulty doing that.  (R. 382-83)

At the time of the hearing, Gettner was 5'4" tall and she weight about 127 or 130 pounds.  She stated her weight had fluctuated during the previous two years from as high as 170 pounds to as low as 120 pounds.  She stated some medications make her gain weight, and others make her nauseous and cause her to lose weight.  (R. 384)

Gettner takes several medications for her seizure disorder.  She stated she has no insurance, no state medical aid to help her pay for the medications, and her husband does not make enough money to support her.  According to Gettner, she sometimes has difficulty affording her medications, and she has borrowed money from her mother on occasion to buy medications.  Because of her financial difficulties, she has not always been able to take all of the medications that are prescribed for her.  Sometimes she breaks her dosage in half to make the medications last longer.  (R. 384-86)

Gettner stated she does not have a driver's license due to her seizure disorder.  She lost her license permanently in 2002 or 2003.  (R. 286-87)

Gettner indicated she hurt her back in a car accident sometime close to the date she got married in 1992.  She quit working when she got married because she did not have a driver's license and when she lived at home, her mother had been driving her to work.  Gettner stated she still has problems with her back.  She has trouble standing or sitting for long periods of time.  She has never been treated for her back injury, although according to her, x-rays taken in 2003, by her family doctor, show she has compression fractures of her thoracic spine.  (R. 387-89)

Gettner stated she and her husband have had some relationship difficulties, and although they live in the same household, they live in separate rooms.  (R. 385, 389)  Her husband helps pay the household expenses.  They have a ten-year-old son who has ADHD.

He began having problems at about age five or six. Gettner does not receive any type of financial assistance for her son. He sees a mental health counselor at the school every other week. (R. 389-90)

Gettner does not believe she could perform any type of work because of her migraines. She stated she "might miss quite a few days a week." (R. 391) Gettner estimated she can lift ten or fifteen pounds. She can stand for a couple of hours at a time, but she usually changes positions frequently from sitting to standing. She can sit for forty or fifty minutes at a time. (R. 392-93)

## 2. Gettner's medical history

### a. Seizures, headaches, and other medical treatment

The record indicates Gettner was evaluated for seizures at age fifteen, in February 1986. She and her mother reported that Gettner had experienced nocturnal seizures for about one year. Gettner also complained of frequent headaches that occurred once or twice weekly, often awakening her from sleep. She missed one to two days of school per week as a result of her headaches. She apparently was already taking Dilantin, because notes indicate the doctor ordered a Dilantin level, with plans to adjust her dosage as needed. Secondary medications were also being considered, as well as a CT scan to rule out the possibility of an intracranial lesion. (R. 338-41)

The next record evidence of treatment for Gettner's seizures is when she was seen by Sherrill J. Purves, M.D., a neurologist, on April 19, 2000. Dr. Purves assessed Gettner with nocturnal, generalized, tonic clonic seizures, which she noted were under quite good control. Gettner stated she had not had a seizure since Christmas, and she only had one or two during 1999. Gettner was taking Dilantin, which was causing side effects including gum hypertrophy and other problems. The doctor changed Gettner's medication to Depakote, which she noted also could help Gettner's migraine headaches. She noted

Gettner exhibited symptoms of possible primary generalized epilepsy, which also would be aided by Depakote, and she indicated the drug also would be good for mood and cognition. (R. 125-26)

Dr. Purves further assessed Gettner with migraines, which Gettner stated caused her to be bed-ridden for multiple days at a time. Gettner stated she could not remember things well during a migraine. She described her headaches as pounding. The doctor noted Gettner stated she was avoiding caffeine, but she arrived at her appointment drinking a diet Dr. Pepper. Dr. Purves directed Gettner to track her headaches. (*Id.*)

Dr. Purves also assessed Gettner with neurofibromatosis, type I ("NF1"), peripheral type, a condition shared by Gettner and two of her three children.[1] Gettner apparently was seeing a geneticist at the University of Iowa in connection with the condition, and Dr. Purves asked for copies of those records. The doctor noted Dilantin has a propensity to affect connective tissues, which was another reason for changing Gettner's medication to Depakote. She also directed Gettner to continue taking Folic Acid, given the possibility that she could become pregnant. (*Id.*)

Dr. Purves saw Gettner again on June 2, 2000, for follow-up. She noted Gettner's change from Dilantin to Depakote had been completed for only two weeks by this time. Gettner reported her headaches had decreased considerably and she was having some headache-free days. The doctor noted Gettner spoke better and her thinking was much quicker. Her seizures remained under complete control. Dr. Purves prescribed Imitrex

---

[1]Neurofibromatosis is a genetic disorder of the nervous system that affects the development and growth of nerve tissues. The condition causes tumors to grow on nerves and may cause other abnormalities such as skin changes and bone deformities. Symptoms may include hearing loss, tinnitus, poor balance, headache, facial pain, and facial numbness. In most cases, symptoms from NF1 are mild and do not interfere with a patient's ability to live a normal, productive life. However, in some cases, NF1 can be severely debilitating. *See* website of the National Institute of Neurological Disorders and Stroke, www.ninds.nih.gov/disorders/neurofibromatosis (Apr. 20, 2006).

for Gettner's headaches and directed her to keep a headache diary. She advised Gettner to return for follow-up in six months. (R. 124)

Gettner underwent an EEG study on September 27, 2000. (R. 127-29) The study was largely normal, and improved from a previous study in 1995, when Gettner was taking Tegretol. She exhibited one "questionable burst of frontal dominant abortive sharp activity," which Dr. Purves noted could be "a residual from a generalized epilepsy" but also might be "a muscle contamination." (R. 129) The doctor noted it was impossible to distinguish the cause on the basis of a single burst during a single EEG. She noted there was "no evidence of any ongoing absence seizure activity." (R. 129)

Dr. Purves saw Gettner for follow-up on September 27, 2000. Gettner complained of side effects from the Depakote including some alopecia and weight gain. Her headaches remained well controlled. She had tried the Imitrex only once, and noted it did not help her headache much and it "gave her a lot of palpitations." (R. 130) She also had tried Maxalt, without effect. Gettner complained of some decreased memory, and she wondered if she was having some minor seizures. Dr. Purves decreased Gettner's Depakote dosage. Gettner called the next morning stating she felt like she was going to have a seizure after taking the reduced Depakote dosage the previous evening. Dr. Purves directed her not to reduce her dosage. She also noted Gettner's EEG study "did not show any suggestion of seizure activity." (*Id.*)

Gettner returned to see Dr. Purves on January 24, 2001. Gettner reported she was having nocturnal seizures once or twice a week. Dr. Purves noted Gettner's social situation remained chaotic and her husband had left her. The doctor continued Gettner on Depakote, and directed her to call in a couple of weeks if her nocturnal seizures continued. She noted Gettner had "difficulty keeping appointments." (R. 161)

Gettner saw Dr. Purves on May 2, 2001, for follow-up. She requested a form to send to the driver's license office, where staff had found out Gettner was taking Depakote.

The doctor noted Gettner's headaches were under somewhat better control. Gettner stated her headaches had "acted up a bit more" for a few weeks, but she was only taking Ibuprofen for the headaches. Dr. Purves continued Gettner on Depakote. She noted the following regarding Gettner's condition:

> With the improvement on Celexa I think the nocturnal events she was worried about on the last visit were probably not seizures but some type of depression equivalent and I am assuming her last significant nocturnal event was December 1999 and completed the driver's form with that information.

(R. 168) She directed Gettner to follow up in six months.

On February 1, 2002, Gettner saw Dr. Purves for follow-up of her "longstanding and nocturnal generalized seizures, intractable migraine, and neurofibromatosis." (R. 174) The doctor noted she had not seen Gettner since May 2, 2001. Gettner reported an increase in "breakthrough morning seizures," which left her fatigued during the day. The doctor increased Gettner's Depakote dosage and directed her to continue taking the Celexa. (*Id.*)

On February 19, 2002, Gettner was admitted to the hospital "for continuous EEG monitoring and an MRI because of the neurofibromatosis history and her complaint of right-sided sensory loss." (R. 177) Her head MRI was normal. (R. 181) During her three-day hospital stay, Gettner exhibited no seizure activity even after withdrawal of her Depakote. She was restarted on the Depakote before her discharge on February 22, 2002, because Dr. Purves noted the drug had "been quite successful in controlling [Gettner's] migraines." (R. 177)

Gettner saw Dr. Purves again on March 13, 2002. The doctor explained the EEG testing had shown no evidence of epilepsy. She stated Gettner may have been diagnosed with epilepsy but she actually might be having non-epileptic seizures, although she noted the diagnosis was hard to prove. Dr. Purves also noted Gettner's seizure activity worsened in periods of higher stress. She continued Gettner on Depakote and Celexa. (R. 194)

Dr. Purves saw Gettner on July 8, 2002. Gettner reported nocturnal events about once per month since her last appointment. She was doing well with her depression and had been weaned off of Celexa. She was staying active doing volunteer work and had stopped consuming caffeine completely. She complained of weight gain with the Depakote. Dr. Purves switched Gettner from Depakote to Topamax to address the weight gain. (R. 203)

Gettner underwent MRI studies of her brain and her cervical spine on November 15, 2002. Her cervical spine MRI was normal. (R. 205) Her brain MRI showed extensive bilateral sinusitis; left mastoiditis; and "[s]ubtle increase in signal of the left hippocampal formation [that] should be correlated clinically for partial complex epilepsy." (R. 204)

On January 9, 2003, Dennis A. Weis, M.D. reviewed the record and completed a Physical Residual Functional Capacity Assessment form concerning Gettner. (R. 229-37) He found Gettner to have no exertional, postural, manipulative, visual, or communicative limitations. The only limitation he placed on Gettner's ability to work was that she should avoid even moderate exposure to hazards. (R. 233) He noted the record evidence failed to substantiate Gettner's allegations concerning the frequency of her seizures, and no treating source had made specific recommendations regarding Gettner's residual functional capacity. (R. 237) A year later, on January 7, 2004, J.D. Wilson, M.D. reviewed the record and concurred in Dr. Weis's findings. (R. 236)

On January 2, 2003, Gettner saw Ramesh Kumar, M.D. at the University of Nebraska Medical Center for an evaluation of her seizure activity. Doctors at the hospital obtained "correlating video EEG" studies that indicated Gettner's seizures come from her frontal lobe, possibly on both sides. They noted her MRI did not show any lesions in the frontal lobe. (R. 305-07) A repeat EEG on January 23, 2003, was normal. (R. 302-03) Gettner returned for follow-up on March 17, 2003. (R. 298-301) She was taking Topamax, Celexa, and Dilantin. Gettner's diagnoses were frontal lobe seizures and

neurofibromatosis 1. Her seizures were noted to be "suboptimally controlled." (R. 298) Sanjay P. Singh, M.D., Director of the hospital's Epilepsy Program, started Gettner on Dilantin with a plan to taper and discontinue the Topamax. He directed Gettner to return in three months for follow-up. (*Id.*)

Gettner saw Daniel M. Rhodes, M.D. on June 2, 2003, complaining of a "spell" or seizure that had occurred the previous day. Gettner stated she had come out of the grocery store and had been confused for about an hour, thinking she was in Pueblo, Colorado, where she was born. The condition resolved after a couple of hours. Dr. Rhodes scheduled an MRI for June 4, 2003, and checked Gettner's Dilantin levels. (R. 322) The MRI later was cancelled when Dr. Rhodes learned Gettner had had an MRI two months earlier. She was directed to take her previous MRI films with her to her next appointment at the University of Nebraska. (R. 321)

Gettner saw Dr. Singh on July 2, 2003. He scheduled Gettner for video EEG monitoring because she was not responding well to antiepileptic medications. The doctor added Lamictal to Gettner's medications for better seizure control. (R. 295-96)

Gettner saw Dr. Rhodes on Monday, July 7, 2003, complaining of pain in her right side that had started after she had a seizure the previous Friday. According to Gettner, her husband had witnesses the seizure "and indicated it was a significant one lasting a minute." (R. 321) Gettner stated it hurt to breathe. She reported that she currently was off seizure medications at Dr. Singh's direction, and she was scheduled for a hospital stay in the near future for further evaluation of her seizures. Dr. Rhodes prescribed Darvocet for Gettner's pain. (*Id.*)

Gettner returned to see Dr. Rhodes on August 4, 2003, complaining of right arm pain following a seizure. She stated her hospital evaluation was scheduled for five days in September. She was taking Dilantin. She was diagnosed with a shoulder strain.

Dr. Rhodes increased the Dilantin dosage. (R. 319) On August 6, 2003, Gettner reported Dr. Singh was in agreement with increasing the Dilantin dosage. (*Id.*)

Gettner called Dr. Rhodes's office on August 28, 2003, and reported having a bad seizure while she was sleeping. She had felt "strange all day," and felt her symptoms were worsening. She reportedly felt "disconnected, numb, heart racing." (R. 318) She was advised to go to the outpatient clinic. She stated she could not drive but her husband was due home soon and she would have him bring her. (*Id.*) There is no record that she was seen later that day.

On September 22, 2003, Gettner was admitted to the University of Nebraska Hospital for "video-imaging monitoring and to record EEG changes at the time of seizures, basically to define where the seizures are coming from, whether generalized or focal." (R. 312) Her antiepileptic medications were withdrawn and Gettner had two seizure episodes on September 28 and 29, 2003. "The first episode was seen in video EEG as tonic spasm and jerking of . . . both upper extremities. [She] was unresponsive during that time." (R. 308) Similar findings accompanied the second seizure. (R. 308, cont. on R. 304) An MRI of her brain on September 29, 2003, was normal, both with and without contrast. (R. 304) She was discharged on October 1, 2003, with a final diagnosis of epilepsy. (R. 308) Specifically, the doctors' diagnostic impression was epileptic seizures, "[c]linicaly consistent with Nonlesional Frontal lobe epilepsy." (R. 304) Dilantin and Lamictal were prescribed, and she was directed to follow up with Dr. Singh. (*Id.*)

Gettner called Dr. Rhodes's office on October 23, 2003, complaining of a migraine for two days with nausea, vomiting, dizziness, and difficulty focusing. She was advised by the doctor and a nurse that she should be seen. Gettner stated she did not have a ride, but she would see if she could find a ride. (R. 318) There is no record that she was seen later that day.

Gettner saw Dr. Rhodes on October 30, 2003, stating she had had another seizure that morning. She stated she recently had spent ten days in the hospital in Omaha, where they changed her medication to Lamictal. She stated she had not called her neurologist about her seizure that day because he would want her to go to Omaha, and she had no way to get there. She was told to use Ibuprofen and cool packs for right shoulder pain, and to contact her neurologist in Omaha regarding the seizure. (R. 317)

On December 5, 2003, Gettner called Dr. Rhodes's office to request a blood sugar test, which was ordered. (R. 317)

### b.    *Mental health treatment*

The record contains a psychological assessment of Gettner when she was in the tenth grade, in 1986. (R. 344-45) The assessment indicates Gettner's broad cognitive ability was in the "below average range." (R. 344) Her verbal ability, reasoning, and visual perceptual speed all were average for her age, but memory functioning was below average. Testing suggested Gettner would do better on tasks requiring short-term visual memory, rather than auditory memory. Her academic achievement in reading, math, and written language was somewhat below her expectancy levels based on aptitude tests. (*Id.*)

Gettner's current mental health history, as documented in the record, begins on January 8, 2000, when she was seen by Lucille Swalve, a Licensed Independent Social Worker, for an intake evaluation. Gettner stated she was depressed and was having difficulties in her marriage. She stated she lacked self-confidence. She had given birth to a daughter two years earlier, and she stated after her daughter was born, her husband had her hospitalized in a psychiatric ward and he began divorce proceedings, which later were dropped. Ms. Swalve took a full history, and diagnosed Gettner with major depression; personality disorder with "cluster B traits"; problems with her primary support

group; and occupational and economic problems. She assessed Gettner's current GAF at 55, indicating moderate symptoms.

Gettner saw Ms. Swalve somewhat regularly from January 2000 through May 2001, and then once in late July 2001. (*See* R. 132-53, 162, 164-67, 281, 285-88) In her sessions, Gettner reported ongoing depression, frustration, and feelings of being overwhelmed, largely due to her strained relationship with her husband and the family's financial difficulties. Treatment notes suggest Gettner was only able to get herself out of bed most mornings because she had to care for her children. She lacked any type of support system and lacked sufficient coping skills, which the social worker attempted to address during Gettner's therapy sessions. However, treatment notes indicate Gettner made little progress and remained depressed. (*Id.*)

On January 23, 2001, Gettner underwent a psychiatric medical evaluation by Daniel W. Gillette, M.D. at Siouxland Mental Health Center. (R. 148-60) His diagnostic impressions were as follows:

Axis I:      Major Depressive Disorder, single episode, severe.
             Dysthymia.
             Adjustment Disorder with anxious mood.
             [Rule out] Pseudoseizures.

Axis II:     Borderline Intellectual Functioning, provisional.
             Traits of Cluster B Personality Disorder.

Axis III:    Seizure Disorder.

Axis IV:     Moderate psychosocial stressors with separation from her husband

Axis V:      A [GAF] rating of 49 with serious symptoms and difficulty functioning. Her best level of functioning in the last year is unknown.

(R. 160) Dr. Gillette started Gettner on Celexa, an antidpressant medication. He directed her to continue her therapy sessions with Ms. Swalve and her neurological care with Dr. Purves. (*Id.*)

16

On February 13, 2001, Gettner reported to Dr. Gillette that she had noticed some improved mood initially after starting the Celexa, but she now was feeling tired and her mood was at baseline. The doctor increased Gettner's Celexa dosage. (R. 163) By May 15, 2001, Gettner was feeling well on the increased Celexa dosage. She noted she had lost her driver's license "due to her epilepsy." (R. 172, 284)

Gettner saw Dr. Gillette on March 27 2001. She reported no improvement with the increased Celexa dosage, and the doctor again increased her dosage. (R. 289)

Gettner next saw Dr. Gillette on July 17, 2001. She had regained her driver's license and was looking for work. Dr. Gillette noted Gettner was "feeling discouraged lately because she has been looking for work since May and can't find it. Her last job was 10 years ago and she believes this is why she is having trouble finding work. She had not worked during that time because her husband forbade her." (R. 171, 283) Gettner complained of fatigue, and low energy and motivation. Her medications were continued unchanged, and she was directed to continue her therapy sessions with Ms. Swalve. (*Id.*)

Although Gettner was directed to return for follow-up in three months (*see id.*), she did not see Dr. Gillette again until December 11, 2001, after missing a scheduled appointment on October 16, 2001. (R. 280) She stated she had run out of her medications about a week earlier and she could not afford to refill them. The doctor noted, "It is not immediately clear how she continued to get the medications for that length of time without having an appointment." (R. 169) Gettner stated she had been "recently terminated from her employment due to 'not meeting the standards.' She was serving food at the Woodbury County Community Action Agency," where she had worked since September 2001. (*Id.*) Gettner had not been attending therapy appointments because her husband had quit his job and she had no insurance or money to pay for the sessions. She stated her seizure-like spells had increased. Dr. Gillette gave Gettner samples of Celexa and referred her to an assistance program to help with the cost of Gettner's medications. (*Id.*)

Gettner failed to appear for an appointment with Dr. Gillette on January 8, 2002. (R. 277) She attended psychotherapy sessions with Judy Buss, ARNP, on February 14 and 18, 2002. (R. 175-76) Gettner reported increased seizure activity, and Ms. Buss directed her to follow up with a medical doctor, which Gettner did, as noted above. During her hospitalization for continuous EEG monitoring on February 19-22, 2002, Gettner also was seen by Dr. John Meyers, a psychologist, who administered an MMPI and evaluated Gettner briefly regarding her neurocognitive functioning. Dr. Meyers suggested Gettner had "a very strong somatization profile and [would] need a very specialized followup and assessment to function better." (R. 177) He found Gettner's prognosis to be "generally poor," and her probability of meaningful long-term change to be poor. (R. 185) He recommended further assessment to determine the best type of treatment for Gettner. (R. 177)

Gettner missed appointments with Nurse Practitioner Buss on March 21 and April 11, 2002 (R. 274, 272), but saw her for psychotherapy on March 28 and April 16, 2002. (R. 195-96) Gettner reported feeling lethargic a lot of the time, and having difficulty falling asleep. She was continued on Celexa. (*Id.*)

Gettner returned to see social worker Swalve on May 3, 2002. Ms. Swalve noted Gettner basically reported on her situation but showed no desire to change anything. The therapist was confused as to why Gettner had returned to see her. (R. 197) Gettner returned to see Ms. Swalve on May 10, 2002. She stated she was being sued in connection with a traffic accident that occurred four years earlier, and she was frightened about going to court. The therapist noted Gettner had difficulty verbalizing her thoughts, making much of her therapy "guess work." (R. 202) Gettner failed to show up for an appointment with Ms. Swalve on May 17, 2002. (R. 269)

Gettner saw Nurse Practitioner Buss on June 18, 2002. She reported trouble sleeping, and complained of some facial swelling and lower leg edema. She was continued

on her current medications and advised to return for follow-up in four months. (R. 201, 268)

On October 21, 2002, Gettner received an updated assessment from Siouxland Mental Health. (R. 263-67) Her mental health diagnoses included major depressive disorder, recurrent; dysthymia; and anxiety disorder not otherwise specified. (R. 266) Her current GAF was assessed at 51. Verna Halligan, LISW recommended Gettner attend individual therapy session to address her depression, marital problems, and stress issues. Her therapy goals were learning to express her feelings appropriately and improving her self-esteem. (R. 267) Gettner attended therapy sessions regularly from October 23, 2002, through May 1, 2003 (R. 242-62), after which she failed to appear for further sessions. (R. 240-41) While she was in therapy, Gettner improved in her ability to be assertive with her husband. In January 2003, Gettner reported she had been seen at the University of Nebraska Medical Center, where she had experienced seizures in the doctor's presence, She was quite relieved about this, stating her Sioux City doctors had told her she was not having seizures but was having panic attacks; however, she always thought she was having seizures. According to Gettner, the Nebraska doctor had scheduled further testing and changed her medications. (R. 253-54) As her therapy sessions progressed, Gettner continued to work on assertiveness training and problems in her marriage. Gettner did well and reported feeling good. At her session on April 24, 2003, Gettner told the therapist she had not had a seizure in quite some time and she felt her medications were working for her. (R. 243)

On November 25, 2002, John A. McMeekin, Ed.D. performed a psychological and intellectual assessment of Gettner at the request of Disability Determination Services. (R. 206-10) Gettner's IQ scores on the WAIS-III test were: Verbal Scale 70, Performance Scale 78, and Full Scale 72. (R. 208) Dr. McMeekin's impression was that Gettner's intellectual functioning is in the low borderline range. Gettner was quite slow at getting

organized and completing the testing, and she was slow paced in her ability to carry out instructions, and maintain attention, concentration and pace. Dr. McMeekin noted Gettner was "one of the more slow paced people with whom [he has] worked, many of whom were retarded, so she is a bit unique in that regard." (R. 209) He found Gettner to be friendly and engaging, but to have somewhat weak social skills and poor eye contact. He noted her slow response time "would be difficult to tolerate if she were in a job where verbal fluency is central." (R. 210) Gettner performed poorly in arithmetic skills, and Dr. McMeekin opined she would not be able to handle benefits herself. Gettner was confused easily and had poor retention, and Dr. McMeekin noted he had to repeat things to her often. (R. 210)

On December 9, 2002, Dee E. Wright, Ph.D. reviewed the record and completed a Psychiatric Review Technique form (R. 211-22), and a Mental Residual Functional Capacity Assessment form (R. 223-28) concerning Gettner. Dr. Wright found Gettner has medically-determinable mental impairments consisting of "Borderline Intellectual Functioning; a Major Depressive Disorder with underlying dysthymia; and a Personality Disorder with cluster 'B' traits predominant." (R. 228) Dr. Wright opined she would have moderate limitations of functioning. Dr. Wright noted a work performance assessment indicated Gettner exhibited variable motivation, required continuous supervision, and seemed not to care when her work was unsatisfactory. Based on the evidence of record and Gettner's reported level of daily activities, Dr. Wright opined Gettner would have "moderate cognitive restrictions of function," and "difficulty consistently performing any complex cognitive activity that would require prolonged attention to minute details and rapid shifts in alternating attention." (*Id.*) However, Dr. Wright found Gettner could sustain non-complex, repetitive, and routine cognitive activity when motivated to do so. Dr. Wright found Gettner to have no markedly severe limitations of functioning, and opined she can travel independently, drive daily, provide

adequate care to herself and her children, and "engage in independent, goal oriented activity when it is in her interested [sic] to do so." (R. 228) Dr. Wright noted the record raised questions concerning Gettner's credibility in reporting her symptoms. (*Id.*)

A year later, on December 31, 2003, David G. Beeman, Ph.D. reviewed the record and affirmed Dr. Wright's findings. Dr. Beeman noted he had reviewed updated information in the file that showed Gettner had received ongoing mental treatment through May 1, 2003, "after which she apparently quit treatment," and her updated records "do not reflect a deterioration of mental function such that the previous assessment remains appropriate." (R. 211)

### 3. *Vocational expert's testimony*

The VE described Gettner's past relevant work as follows:

> Basically for the record, the claimant performed really in four types of work, one is a laundry worker, another is a food service aide, another is a fast food worker and another as a cleaner and housekeeping, which is the lodging facility work that she did. All of those positions are classified as unskilled, [and] she testified that they all ranged within the light physical demands. And the only one, the laundry worker, as normally performed is medium. Because they are all unskilled there would be no acquired skills.

(R. 394)

The ALJ asked the VE to consider an individual thirty-four years of age, twenty-four at the alleged onset date, with a high school education, special education classes, and Gettner's past relevant work. He then asked the VE the following hypothetical question:

> My first hypothetical would limit to the, limitations to only simple, routine, repetitive work, meaning constant. No – or only occasional changes in the routine work setting. No production rate pace defined as strict quotas or timeframes. Would frequently understand, remember and carry out simple instructions. Occasional supervisor, meaning must be

21

reminded of tasks four times per day. Only occasional interaction with the public. With those restrictions could claimant do any of her past relevant work, as either she did it or as it's normally performed?

(*Id.*) The VE stated the individual could return to Gettner's past work in food service or as a housekeeper/cleaner, but not to the fast food job.

The ALJ posed a second hypothetical question that incorporated the above limitations but added the following physical exertional limitations: lift ten pounds frequently, twenty pounds occasionally; stand for two hours at a time; sit for one hour at a time; and ability to alternate between sitting and standing at will. The VE stated these limitations would preclude the individual from returning to Gettner's past relevant work, but there would be other jobs available in the national economy that the individual could perform, such as office helper, lot attendant, and mail clerk. (R. 395-96) However, if the individual had to miss three or more days of work (presumably per month, although not so stated) due to migraines, then the VE stated there would be no jobs the individual could perform. (R. 395)

**4.     *The ALJ's opinion***

The ALJ noted that although Gettner amended her alleged onset date to December 1, 1994, at the ALJ hearing, her "earliest entitlement date in a Title XVI claim is the date of filing, which in this case is August 30,2002." (R. 19) He found Gettner has not engaged in substantial gainful activity since that date. (*Id.*)

The ALJ found Gettner has severe impairments including seizures, migraines, depression, and borderline intellectual functioning. However, he found her impairments, singly or in combination, are not of Listing level. He specifically found her impairments

do not meet the criteria for Listings 11.03[2], 12.04[3], or 12.05[4]. The ALJ noted Gettner's limitations in the activities of daily living are mild, and her difficulties in maintaining social functioning, concentration, persistence, and pace are moderate. Her I.Q. scores indicate she functions in the borderline range. "[H]er extensive daily activities, including the ability to care for her children, and her ability to work in the past, indicate adequate adaptive functioning," and "her other impairments, including her depression, are relatively well controlled with medication, at least during working hours." (R. 20)

In evaluating Gettner's credibility pursuant to *Polaski*, the ALJ noted Gettner "has a poor work history with many years of low or no earning levels . . . [and] little motivation to work." (*Id.*) The ALJ noted Gettner's seizures are nocturnal, which would not affect her ability to work. He found Gettner's "migraines and seizures are not as disabling as alleged and would cause little if any limitation in the work environment." (R. 21) He also relied on the fact that none of Gettner's treating physicians had imposed

---

[2]      11.03   Epilepsy – nonconvulsive epilepsy (petit mal, psychomotor, or focal), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment. With alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.03.

[3]      12.04   Affective Disorders: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.

*Id.*, § 12.04. The section includes additional requirements regarding the severity of symptoms. *See id.*

[4]      12.05   Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

*Id.*, § 12.05. The section includes additional requirements regarding the severity of symptoms. *See id.*

work limitations on her or indicated she would be unable to work due to her seizures and/or migraines.  (*Id.*)

The ALJ found Gettner has the following residual functional capacity:

> The claimant is able to do only simple, routine, repetitive work with occasional changes in a routine work setting.  She cannot perform at production rate pace, defined as strict quotas or timeframes.  The claimant can frequently understand, remember and carry out simple instructions with occasional supervision, meaning she must be reminded of tasks up to four times per day.  The claimant can only have occasional inter-action with the public.

(R. 21-22)  Giving weight to the VE's testimony based on an individual with these limitations, the ALJ found Gettner's residual functional capacity would allow her to perform her past relevant work as a cleaner/housekeeper, cook helper, and laundry worker II.  He therefore concluded Gettner has "not met the Step 4 burden of proof," and she is not disabled.  (R. 22)

## III.  DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND THE SUBSTANTIAL EVIDENCE STANDARD

### A.  Disability Determinations and the Burden of Proof

Section 423(d) of the Social Security Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505.  A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 432(d)(2)(A).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations.  20 C.F.R. §§ 404.1520 & 416.920; *Goff v. Barnhart*, 421 F.3d 785 (8th Cir. 2005); *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003); *Kelley v. Callahan*, 133 F.3d 583, 587-88 (8th Cir. 1998) (citing *Ingram v. Chater*, 107 F.3d 598, 600 (8th Cir. 1997)).  First, the Commissioner will consider a claimant's work activity.  If the claimant is engaged in substantial gainful activity, then the claimant is not disabled.  20 C.F.R. § 404.1520(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon*, 353 F.3d at 605; *accord Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003).  The United States Supreme Court has explained:

> The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." . . . Such abilities and aptitudes include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers, and usual work situations"; and "[d]ealing with changes in a routine work setting."

*Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987) (citing 20 C.F.R. §§ 404.1521(b), 416.921(b)).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment.  If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is

considered disabled, regardless of age, education, or work experience. 20 C.F.R. § 404.1520; *Kelley*, 133 F.3d at 588.

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity ("RFC") to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(4)(iv); 404.1545(4); *see Lewis*, 353 F.3d at 645-46 ("RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, 'what the claimant can still do' despite his or her physical or mental limitations.") (citing *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987); 20 C.F.R. § 404.1520(e) (1986)); *Dixon*, *supra*. The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 404.1545(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(iv).

Fifth, if the claimant's RFC as determined in step four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner "to prove that there is other work that [the claimant] can do, given [the claimant's] RFC [as determined at step four], age, education, and work experience." Clarification of Rules Involving Residual Functional Capacity Assessments, etc., 68 Fed. Reg. 51,153, 51,155 (Aug. 26, 2003). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in

significant numbers in the national economy.  *Id.*; 20 C.F.R. § 404.1520(4)(v); *Dixon, supra*; *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) ("[I]f the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.") (citing *Cox v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998)); *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000).  If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled.  If the claimant cannot make an adjustment to other work, then the Commissioner will find the claimant is disabled. 20 C.F.R. § 404.1520(r)(v).  At step five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant.  *Goff*, 421 F.3d at 790 (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)).

## B.  *The Substantial Evidence Standard*

The court reviews an ALJ's decision to determine whether the ALJ applied the correct legal standards, and whether the factual findings are supported by substantial evidence on the record as a whole.  *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003); *Banks v. Massanari*, 258 F.3d 820, 823 (8th Cir. 2001) (citing *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000)); *Berger v. Apfel*, 200 F.3d 1157, 1161 (8th Cir. 2000) (citing 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)).  This review is deferential; the court "must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole.  *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . .").  Under this standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to

support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)); *accord Pelkey, supra* (quoting *Goff*, 421 F.3d at 789).

Moreover, substantial evidence "on the record as a whole" requires consideration of the record in its entirety, taking into account both "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Id.* The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (also citing *Cline, supra*).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Secretary of Health & Human Serv.*, 879 F.2d 441, 444 (8th Cir. 1989) (citing *Steadman v. S.E.C.*, 450 U.S. 91, 99, 101 S. Ct. 999, 1006, 67 L. Ed. 2d 69 (1981)). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record *de novo*." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, [the court] must affirm the [Commissioner's] decision." *Id.* (quoting *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992), and citing *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989)); *accord Baldwin*, 349 F.3d at 555; *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (citing *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)); *accord Krogmeier,* 294 F.3d at 1022 (citing *Woolf*, 3 F.3d at 1213). The court may not reverse

the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Goff*, 421 F.3d at 789 ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion."); *Baldwin*, 349 F.3d at 555 (citing *Grebenick v. Chater*, 121 F.3d 1193, 1198 (8th Cir. 1997)); *Young*, 221 F.3d at 1068; *see Pearsall*, 274 F.3d at 1217; *Gowell*, 242 F.3d at 796; *Spradling v. Chater*, 126 F.3d 1072, 1074 (8th Cir. 1997).

On the issue of an ALJ's determination that a claimant's subjective complaints lack credibility, the Sixth and Seventh Circuits have held an ALJ's credibility determinations are entitled to considerable weight. *See, e.g., Young v. Secretary of H.H.S.,* 957 F.2d 386, 392 (7th Cir. 1992) (citing *Cheshier v. Bowen,* 831 F.2d 687, 690 (7th Cir. 1987)); *Gooch v. Secretary of H.H.S.,* 833 F.2d 589, 592 (6th Cir. 1987), *cert. denied*, 484 U.S. 1075, 108 S. Ct. 1050, 98 L. Ed. 2d. 1012 (1988); *Hardaway v. Secretary of H.H.S.,* 823 F.2d 922, 928 (6th Cir. 1987). Nonetheless, in the Eighth Circuit, an ALJ may not discredit a claimant's subjective allegations of pain, discomfort or other disabling limitations simply because there is a lack of objective evidence; instead, the ALJ may only discredit subjective complaints if they are inconsistent with the record as a whole. *See Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir. 1994); *see also Bishop v. Sullivan,* 900 F.2d 1259, 1262 (8th Cir. 1990) (citing *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984)). As the court explained in *Polaski v. Heckler:*

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1)  the claimant's daily activities;
> 2)  the duration, frequency and intensity of the pain;
> 3)  precipitating and aggravating factors;
> 4)  dosage, effectiveness and side effects of medication;

5)      functional restrictions.

*Polaski*, 739 F.2d 1320, 1322 (8th Cir. 1984). *Accord Ramirez v. Barnhart*, 292 F.3d 576, 580-81 (8th Cir. 2002). The court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).

## IV. ANALYSIS

The Commissioner seeks an order reversing and remanding this case for further consideration of Gettner's claim. The Commissioner indicates "the ALJ did not articulate a full explanation of his findings at step three" of the sequential evaluation process. (Doc. No. 13, p. 2) The Commissioner further notes "the ALJ's error at step four prevented the record from being fully developed to determine if [Gettner] could perform other work at step five." (*Id.*) The Commissioner states that upon remand, the ALJ would be directed to "reassess whether [Gettner] met any listed impairment and reevaluate whether any of [her] prior employment was past relevant work." (*Id.*, p. 1)

Gettner argues the evidence shows she meets all of the criteria of Listing 12.05C, she is "presumptively disabled" under that Listing, and she should not have to wait another year or more for an ALJ to reconsider her claim and grant benefits. Instead of remand for further proceedings, Gettner seeks reversal and remand for calculation and award of benefits. (Doc. No. 16)

As Gettner notes in her brief, the regulations for consideration of Mental Disorders provide that "[i] cases where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series, we use the lowest of these in conjunction with 12.05." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00D(6)(c). In the present case, Gettner's lowest IQ score was 70. (R. 208) The Commissioner admits "the ALJ apparently misstated the Agency's

policy that the lowest IQ score is used to evaluate whether a claimant's intellectual functioning meets the requirements of a listing and that the ALJ did not specifically address listing 12.05C." (Doc. No. 15, p. 6) However, the Commissioner argues the case should be remanded to allow the ALJ to properly apply listing 12.05C to Gettner's impairments.

Listing 12.05C provides that an impairment reaches the required level of severity for mental retardation when the individual has "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]" 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C. In this case, Gettner's IQ of 70 falls within the listing's requirements. The question, therefore, is whether substantial evidence in the record shows Gettner had some other impairment that imposes upon her "an additional and significant work-related limitation of function." (*Id.*) The court finds the record contains such substantial evidence.

The record indicates Gettner has suffered from a seizure disorder since she was a teenager. Although the disorder was not definitively diagnosed until 2003, the evidence shows she has been having seizures, and has been treated for them, as far back as 1986, when she was fifteen years old. The record also establishes that Gettner suffers from severe migraine headaches. Indeed, the ALJ found Gettner's severe impairments include migraine headaches, seizures, and depression, in addition to her impaired intellectual functioning. The record contains substantial evidence to support Gettner's claim that she would have to miss at least three days of work each month due to her impairments – a fact which the VE testified would preclude her from all competitive employment. The court finds it is of no consequence that the record contains no opinions from Gettner's treating physicians regarding her functional abilities where the ALJ never asked her treating sources to provide such an opinion. *See Smith v. Barnhart*, 435 F.3d 926, 930 (8th Cir. 2006).

Considering the evidence as a whole, the court finds the record does not contain substantial evidence to support the ALJ's decision that Gettner is not disabled. The court may affirm, modify or reverse the Commissioner's decision with or without remand to the Commissioner for rehearing. 42 U.S.C. § 405(g). In this case, where the record itself "convincingly establishes disability and further hearings would merely delay receipt of benefits, an immediate order granting benefits without remand is appropriate." *Cline v. Sullivan*, 939 F.2d 560, 569 (8th Cir. 1991) (citing *Jefferey v. Secretary of H.H.S.*, 849 F.2d 1129, 1133 (8th Cir. 1988); *Beeler v. Bowen*, 833 F.2d 124, 127-28 (8th Cir. 1987)); *accord Thomas v. Apfel*, 22 F. Supp. 2d 996, 999 (S.D. Iowa 1998) (where claimant is unable to do any work in the national economy, remand to take additional evidence would only delay receipt of benefits to which claimant is entitled, warranting reversal with award of benefits). The court finds the ALJ's decision should be reversed, and this case should be remanded for calculation and award of benefits.

## V. CONCLUSION

Therefore, **IT IS RESPECTFULLY RECOMMENDED**, for the reasons discussed above, unless any party files objections[5] to the Report and Recommendation in accordance with 28 U.S.C. § 636 (b)(1) and Fed. R. Civ. P. 72(b), within ten (10) days of the service

---

[5]Objections must specify the parts of the report and recommendation to which objections are made. Objections must specify the parts of the record, including exhibits and transcript lines, which form the basis for such objections. *See* Fed. R. Civ. P. 72. Failure to file timely objections may result in waiver of the right to appeal questions of fact. *See Thomas v. Arn*, 474 U.S. 140, 155, 106 S. Ct. 466, 475, 88 L. Ed. 2d 435 (1985); *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

of a copy of this Report and Recommendation, that the Commissioner's decision be reversed and this case be remanded for calculation and award of benefits.

**IT IS SO ORDERED.**

**DATED** this 2nd day of May, 2006.

PAUL A. ZOSS
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT